**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARY BURTON,** | : | **Civil No. 4:13-CV-880** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **HECKMANN WATER RESOURCES,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

The plaintiff in this action, Cary Burton ("Burton" or the "plaintiff"), is an

African American man.  For several months in 2011, he was employed as a driver by

the defendant, Heckmann Water Resources ("Heckmann" or the "defendant"), a

company in the business of delivering water for use in hydraulic fracturing by

companies extracting natural gas in the Marcellus Shale found in Pennsylvania's

Northern Tier counties.  Burton drove a truck for Heckmann, delivering water to job

sites, and performing related tasks.  Burton's time at Heckmann was short, spanning

approximately four months.  During his tenure, Burton claims that his employment

was a distinctly hostile work experience, polluted by a campaign of racially bigoted

and threatening comments by his co-workers directed specifically at him, and further

aggravated by a lack of support from Burton's direct supervisors, some of whom are also claimed to have been overheard making their own racially insensitive or insulting remarks and responding ineffectively to Burton's complaints for months. After Burton felt physically threatened by a co-worker, and was himself disciplined for a minor accident in a manner he found to be unfair, he left his employment with Heckmann, having found that his work environment was overtly hostile, and having found that management responded ineffectively to his complaints. This lawsuit followed, with Burton claiming that Heckmann discriminated against him on the basis of race, in violation of state and federal law.[1]

The defendant has a very different take on Burton's claims, and particularly on the adequacy of the company's response to Burton's complaints of discrimination by co-workers. Heckmann claims that Burton contributed to the problems he faced at work by failing to assist in the investigation into his allegations of abuse by co-workers by refusing to identify them, and that when the company was later armed with sufficient information about the conduct, it took what it insists was prompt, decisive and appropriate action, including by firing certain employees and providing

---

[1] Burton brings claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"), 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 951 et seq. ("PHRA").

targeted training by human resources staff. The defendant also suggests that Burton's work environment was not as corrosive as he alleges, and in any event the company maintains that it acted in an appropriate manner when made aware of all of the circumstances surrounding Burton's claims. The defendant further argues that even if the plaintiff encountered regular and routine use of racial epithets in the workplace, the conduct should be declared as a matter of law not to be sufficiently serious as to amount to a hostile work environment that is actionable under state and federal civil rights laws.

The defendant has moved for summary judgment on Burton's claims. Burton has responded to the motion, arguing that the defendant misconstrues the record and that Heckmann improperly urges the Court to view this matter in the light most favorable to Heckmann – something inappropriate at the summary judgment stage. The defendant's motion is fully briefed and is ripe for disposition.

Upon consideration of the entire record, viewing that record in the light most favorable to Burton as we must, and resolving all ambiguities and inferences in Burton's favor, we find that Burton has provided adequate evidentiary support for his hostile work environment claims, and that there remain disputed issues of fact that cannot be resolved through summary judgment motions practice, but require that the

claims be put before a jury at trial.  Accordingly, the defendant's motion for summary judgment will be denied.

## II.    BACKGROUND[2]

Heckmann Water Resources is a subsidiary of Heckmann Corporation, a Delaware corporation that, along with its various subsidiaries, is an environmental solutions company providing full-cycle environmental solutions to its customers in the energy and industrial end-markets.  Heckmann provides fresh water for fracking activities in the Marcellus Shale region, and uses trucks and employs company drivers to transport the water to natural gas sites.

Burton is an African American man, and was hired by Heckmann as a water truck driver in mid-April 2011.  He was initially assigned to the night shift, and was compensated at $16 per hour.  During each shift, Burton and Heckmann's other

---

[2]  The factual background to this memorandum is taken from the parties' competing statements of material fact where there is no dispute in the record. Where the record contains disputed issues of fact, they have been interpreted in Burton's favor for purposes of this opinion only, with the supporting evidence identified by citation.  Additionally, in keeping with the standards governing motions for summary judgment in federal court, all reasonable inferences that may be drawn from the factual record have been viewed in the light most favorable to Burton as the non-movant.  At trial, of course, Burton will retain the burden of proving his claims by a preponderance of the evidence, and nothing in this memorandum should be interpreted as conclusively resolving any of the factual disputes that presently exist.  Conclusively resolving those disputes is a task committed to the factfinder at trial.

drivers would make several runs to and from client sites to deliver fresh water and take away used water.

Heckmann maintained terminals in Hughesville, Pennsylvania, and in Wysox, Pennsylvania. Heckmann also maintained a management office in Williamsport. Ron Eichenlaub, Desmond Warzel, Kevin Little, and Brandon Johnson were among the supervisors at the Hughesville terminal. Bernie Hoover was the site manager at the Hughesville terminal, and Cliff Davis was the operations manager. The supervisors ran nightly meetings with the drivers prior to the start of their shifts.

Shortly after Burton was hired, Karen Martin was hired as Heckmann's Regional Human Resources Manager, stationed in Coraopolis, Pennsylvania. She was hired on May 2, 2011, and remained with the company through the fall of 2013. Deborah Carter-Gordley was Heckmann's Director of Human Resources from January 2011 until June 2012, when her employment ended. While she was with the company, Carter-Gordley was Martin's direct supervisor. (Doc. 48, Dep. of Deborah Carter-Gordley at 11, 12, 20.) At the time Burton was hired, Heckmann had a two-page non-discrimination and reporting policy. (Doc. 56, Ex. 3.) The policy provides, in relevant part, that "Employees with questions or concerns about discrimination in the workplace are encouraged to bring these issues to the attention of their supervisor. Employees can raise concerns and make reports without fear of reprisal." (Id. at 1.)

5

Within a week after he was hired, the plaintiff found himself exposed to offensive racial slurs uttered within his presence by a white co-worker, David Weidler, who said that "this place is run by niggers." (Doc. 55, Ex. 4, Pl. Verified PHRC Charge; Ex. 5, Pl. Letter to Cliff Davis.) Burton claims that he asked Weidler to refrain from using the word "nigger" in front of him, but alleges that Weidler continued to use offensive and racially derogatory language at work, using terms such as "niggahjew" and making comments like "nigger, please" within Burton's hearing. According to Burton, Weidler used the word "nigger" in front of 15 people, including supervisors, during a pre-shift meeting. (Doc. 52, Burton Dep. at 51-56.)

Burton complained to his supervisors about these statements, including particularly to Rob Eichenlaub and Desmond Warzel. Nevertheless, Burton testified during his deposition that Weidler persisted in using the word "nigger" in front of him and other co-workers, and in the presence of supervisors Eichenlaub, Johnson and Little. (Id. at 54-55.) According to Burton, Weidler would also hold out his hand in a Nazi salute and bark out "Heil, Hitler" during pre-shift meetings, in the plaintiff's presence, and in the presence of Eichenlaub, Johnson and Little. (Id. at 53-55.) During his deposition, Ron Eichenlaub acknowledged that he did not do anything upon hearing the racist remarks. (Eichenlaub Dep. at 68-69.)

6

Burton complained about not only Weidler's comments, but also those claimed to have been made by another co-worker, Ralph "Zip" Geswhite, who is claimed to have also frequently used the term "nigger" at work sites.  Eichenlaub acknowledged that he had overheard Geswhite use the term "quite a bit" and that he reported it to Hoover, the site manager, on multiple occasions. (Eichenlaub Dep. at 58-59.)  Burton claims that Geswhite also once said that "old black dogs should be hung with new white rope," and made this statement while standing a few feet away from the plaintiff, who was the only African American present.  (Doc. 52, Burton Dep. at 55-56; Doc. 56, Ex. 1, Eichenlaub Dep. at 46; Pl. SMF Ex. 19 (PHRC letter).)  Burton reported this remark to Eichenlaub, who in turn alerted Hoover, who replied that he already knew about it and would take care of it.  (Doc. 56, Ex. 1, Eichenlaub Dep. at 47-48.)

Heckmann claims that it acted upon learning of Burton's complaints in May 2011.  Thus, Heckmann represents that in May 2011, during a pre-shift meeting Heckmann supervisors made some comments regarding harassment, but it appears that the discussion on the subject was limited, and may not have even touched on racial harassment at all, but may have been focused on sexual harassment in the workplace.  (Doc. 59, Pl. Response to Def. Statement of Facts ("Pl. SMF") ¶ 21 and Ex. 29.)

7

Whatever may have been discussed at one pre-shift meeting in May 2011, according to Burton it did nothing to ameliorate or put a stop to the racially offensive commentary being routinely used by Burton's co-workers. Thus, Burton maintains that David Weidler used the word "nigger" every day in the plaintiff's presence, through May and June 2011. In July 2011, Weidler was overheard describing a location as "the town of Niggerama."

By the end of July, the plaintiff again complained to his supervisors, this time writing a letter to Cliff Davis, the operations manager. Shortly thereafter, the plaintiff was moved to the first shift, although the record contains conflicting evidence as to whether this move was intended to accommodate the plaintiff's concerns about racist comments being made in his presence, or if it was entirely unrelated to this issue. (Def. SMF ¶ 30, Ex. C, Deposition of Cary Burton Ex. at 63 and Ex. G, Dep. of Kevin Little at 58; Pl. SMF ¶ 30, Ex. 28, Dep. of Bernie Hoover at 61-62.)

In addition to reporting his concerns to Eichenlaub and Warzel, Burton informed Hoover, the site manager, about the racially offensive remarks being directed at him, or uttered routinely in his presence. It thus appears that Hoover was made aware of the harassment by late May or early June 2011. Hoover testified that he first learned of the racial remarks after being informed by another supervisor, and that he afterward spoke with Burton about it directly. After this point, Hoover claims

that Burton began coming to him "more frequently" about the matter, but because Burton did not identify who was making the comments, Hoover told him that "he couldn't solve the problem." (Hoover Dep. at 47-48.) The plaintiff contends that the racially offensive comments continued at the workplace between May and August 2011. (Doc. 55, Ex. 4 ¶ 18.)

On or about June 27, 2011, Karen Martin, the human resources manager, became aware that this matter persisted in the workplace. (Doc. 55, Ex. 7.) It took two weeks until Martin spoke with Burton, and on July 11, 2011, he told her personally about the harassment he had been facing in the workplace. Martin assured Burton that the matter would be addressed, and that Heckmann's anti-harassment policies would be addressed with the staff during pre-shift meetings. (Doc. 56, Ex. 6.) That day, Martin spoke to Hoover, Eichenlaub and Warzel and was informed that they had been aware of the complained-of conduct for between one and one and a half months. (Id.) The next day, Martin emailed Hoover, and Hoover's supervisors, Danny McCall and Cliff Davis. (Doc. 56, Ex. 7.) In this email, Martin indicates that "this is the second time this topic has come up so please ask questions for understanding and we need to hold employees accountable." (Id.) Martin told these supervisors that they were to inform employees "on the spot that this is not language that will be tolerated." (Id.) Martin included with her email a script for the

supervisors to use that included "core values" to be read at pre-shift meetings.  (Id.)
The script was thereafter read during these meetings, along with the "core values"
sheet, between July 13 and July 15, 2011.  (Doc. 56, Ex. 9.)

The script intended to be used to inform employees of Heckmann's anti-
harassment policies contained a single reference to racial discrimination, and the
"core values" sheet does not contain any reference at all to racial harassment, or what
to do if it occurs.  Instead, it directs employees to "treat each other with respect."
(Id.)  Despite the script and "core values" being shared with staff, on July 17, 2011,
on July 17, 2011, a co-worker called the plaintiff "Buckwheat."  (Doc. 56, Exs. 4
(PHRC verified complaint) and 5.)

Problems persisted, and in short order.  Thus, on July 26, 2011, a hangman's
noose was erected at a job site.  Kevin Little discovered it and cut it down in order to
show Hoover.  (Doc. 56, Ex. 10, Little Note.)  When the noose was found, there was
one African American employee working at the job site.  (Little Dep. at 40.)  Hoover
placed the noose in drawer in an office trailer, and the plaintiff encountered it several
times when he retrieved safety equipment from the cabinet.  (Doc 52, Burton Dep. at
59-62.)  Three days later, on July 29, 2011, a different co-worker called Burton
"Buckwheat."  (Doc. 56, Ex. 5, Burton Letter to Cliff Davis.)

At this point, Burton called off for his next shift and informed Hoover that he would remain out of work "until the discrimination issue . . . was taken care of." (Doc. 56, Ex. 12, Hoover Note.)  On August 1, 2011, Burton again complained to Karen Martin, reporting that he was being subjected to the word "nigger" at work, and again noting that Weidler had been using the word.  (Doc. 56, Ex. 6, Martin Statement; Doc. 47, Martin Dep. at 66-67.)  Martin spoke to Hoover about the matter, but he told her that it had occurred months earlier.  (Doc. 56, Ex. 6.)  Martin also directed Burton to reduce his complaints to writing and provide them to Cliff Davis, which he did.  (Doc. 52, Burton Dep. at 50-51; Doc. 56, Ex. 5, Burton Letter to Davis.)  In his letter, Burton wrote "it is my utmost wish and believe to express and convey to Heckmann Water Resources the very nature of how my basic civil rights were violated."  (Id.)

At this point, several months after Burton found himself regularly exposed to racist language and imagery, Heckmann's director of human resources, Deborah Carter-Gordley determined that it was time to get an outside firm to come in and investigate what was happening at the Hughesville location.  (Doc. 48, Carter-Gordley Dep. at 43-44.)  Then, on August 9 and 10, 2011, an investigator went to the Hughesville site and conducted a series of interviews with staff and supervisors there, though he did not interview Karen Martin to learn what she knew about the situation.

On August 15, 2011, the investigator submitted a report to Carter-Gordley. (Doc. 56, Ex. 13.)

Upon receipt and review of the report, Heckmann began to act.  Based upon the report, David Weidler was fired for making "inappropriate comments." (Doc. 56, Ex. 14.)  The plaintiff was reassigned from the night shift to the day shift, although Hoover later testified that the move was unrelated to his complaints about harassment. (Doc. __, Hoover Dep. at 61-62.)

According to Burton, by going to Heckmann to report the racist comments that had been directed towards him, he faced new forms of harassment by his colleagues. Thus, on August 16, during a meeting with supervisors and staff in which the company's policies were being discussed and employees were directed to use a company "hotline" to report complaints, another white employee, Carl Orso, while looking at the plaintiff referred to it as the "snitch line" and called the plaintiff a "pussy".  Kevin Little observed the conduct, which happened twice, and he wrote it up. (Doc. 56, Ex. 15; Doc. 49, Little Dep. at 44-45; Doc. 52, Burton Dep. at 38-39.) Later the same day, Orso called the plaintiff "boy".  As he had been directed to do, Burton wrote this incident up in a writing, describing it as follows:

> After making comments I'm not getting in the same van with no pussy and then looking at me then this morning saying direct access line is for bitch motherfuckers then looking at me, while at Mt. Energy Carl kept

12

looking at me evil, after several times looking at this me way I ask him did he have a problem with me. He said boy you don't want to fuck with me. He was very angry as if he wanted to hurt me. So I said come out of the truck. That was all that happen. PS - I am now being called every name in the book. First nigger then buckwheat now boy.

(Doc. 56, Ex. 16.)

The incident, which occurred at a job site, was observed by a Heckmann client, who reported it to Davis, and Hoover called the plaintiff back to the yard. (Doc. 56, Ex. 17.) During his return to the yard, the plaintiff called Hoover and asked him why he was being brought back, rather than Orso, since "he's the one that called me a boy?" (Doc. 52, Burton Dep. at 45.) To Burton's surprise, it was he who faced criticism when he arrived back at the yard where he met with Karen Martin, who was on site to handle David Weidler's firing. (Doc. 47, Martin Dep. at 112.) According to Burton, Martin blamed him for the incident, and said he was being written up because he should have handled the situation more effectively. Burton responded by noting that the exchange happened in front of supervisors, and Burton said he thought the supervisors should have handled the matter themselves. Martin said that Burton should have handled the matter in the morning, and not had any discussion with Orso at the work site. (Doc. 52, Burton Dep. at 45-46, 64, 66.) Burton was given a written warning following this exchange. Notably, Orso also received the same written discipline.

13

The harassment persisted.  Thus, less than one week later, the plaintiff was approaching some of his co-workers while waiting to fill his truck and overheard one of the men say "I wish that nigger would ask me if I had a problem with him.  I'll show that fucking nigger."  This statement was punctuated by the speaker banging a hammer against his truck as he said it, and the plaintiff believed the statement was made in reference to him because he had previously asked Orso if he had a problem with him.  (Doc. 52, Burton Dep. at 27-31.)  According to the plaintiff, he was shaken by what he heard and saw, and when he later returned to his truck his distress or anxiety caused him to back his truck into another, causing an accident.  (Id. at 32-33.)  When the plaintiff returned to the work yard, he reported the incident and the accident.  (Id. at 35-36.)  The same day, Hoover gave the plaintiff a warning for the minor accident and required him to undergo a drug test.  (Doc. 56, Ex. 20.)

Also on August 22, 2011, Karen Martin was in Hughesville to conduct anti-discrimination training in person, though Burton had to miss it because Hoover had required him to go for a drug test following the minor traffic accident.

On August 23, 2011, the plaintiff told Hoover he was resigning from his job with Heckmann because of the racial discrimination he had been facing at work for the past several months.  (Doc. 56, Ex. 21.)  In his letter of resignation, Burton wrote, "Due to race discrimination, harassment, retaliation and a hostile work environment,

14

I quit Heckmann Water Resources company effective immediately." (Doc. 56, Ex. 22.)  Several days later, Burton reconsidered and wrote to Martin asking for his job back.  Martin told him she would confer with management, but a few days later the two spoke again and Burton told her he did not want to return.

A few weeks later, Hoover was fired, though he claims he was never provided any explanation.  (Doc. 58-8, Hoover Dep. at 35-38.)  Desmond Warzell was also fired by Dany McCall, who claims that he was not given any reason for the move, but was instead simply told by Martin to terminate Warzel's employment.  (Doc. 56, Ex. 2, McCall Dep. at 34-35.)  According to Carter-Gordley, the director of human resources, she concluded that Hoover and Warzel both knew about Burton's complaints of racial harassment but failed to timely bring those complaints to Martin, or otherwise to "process this correctly." (Doc. 48, Carter-Gordley Dep. at 37-38.) Carter-Gordley represented that initially, Hoover and Warzel had said they did not know what was happening with the plaintiff at work, but later they admitted that they did know, and "much earlier than when Karen [Martin] was called." (Id. at 35-36.)

The plaintiff has claimed that the harassment he experienced, and the stress that accompanied it, caused him to feel menaced and intimidated at work.  He was subsequently treated for depression and anxiety, and prescribed medication by his doctor.  (Doc. 56, Ex. 19, 25.)

After the plaintiff pursued administrative relief before the Pennsylvania Human Relations Commission, he brought this litigation by filing a complaint on April 13, 2013, which he later amended on August 16, 2013. (Docs. 1, 15.) On July 17, 2014, the parties consented to proceed before the undersigned, and on July 21, 2014, the action was transferred to this Court for all further proceedings through and including trial. (Docs. 42, 43.) On July 28, 2014, the defendant filed the instant motion for summary judgment, which was fully briefed on November 21, 2014.

## III.   SUMMARY JUDGMENT

Heckmann has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986).  In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion."  <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment."  <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F.Supp. 474, 482 (D.N.J.1995).  Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials."  <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted).  Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial."  <u>Fireman's Ins. Co. of Newark NJ v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982), <u>see</u> <u>Sunshine Books, Ltd. v. Temple Univ.</u>, 697 F.2d 90, 96 (3d Cir. 1982).  "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient."  <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d Cir. 1969).  Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."  <u>Gans v. Mundy</u>, 762 F.2d 338, 341

(3d Cir. 1985)(citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)). In particular, a plaintiff cannot avoid summary judgment by simply relying upon a self-declaration that he has authored which relies not on evidence, but on the plaintiff's own interpretation of events and, essentially, opinion testimony. <u>See</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990) (the nonmoving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with the conclusory allegations of an affidavit."); <u>Iseley v. Beard</u>, No. 02-2006, 2009 U.S. Dist. LEXIS 52014, *32 (M.D. Pa. Mar. 30, 2010) (conclusory allegations contradicted by documentary evidence cannot be accepted as true).

## IV. **DISCUSSION**

The plaintiff has brought claims for racial discrimination in the workplace, under a hostile work environment theory, pursuant to Title VII, 42 U.S.C. § 1981, and the PHRA. The standards governing these claims are substantially similar, and will be analyzed collectively.[3]

In order to establish the existence of a hostile work environment actionable as a civil rights matter, a plaintiff must prove (1) that he suffered intentional

---

[3] <u>See</u> <u>Daniels v. Sch. Dist. of Phila.</u>, 982 F. Supp. 462, 478 (E.D. Pa. 2013) (legal analysis under all three statutes is the same).

discrimination because of his race; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affective him subjectively; (4) that the discrimination would detrimentally affect a reasonable person of the same protected class in the same position; and (5) the existence of *respondeat superior* liability.  Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006).

Isolated comments and insensitive remarks or unpleasant utterances may not sufficiently affect the conditions of employment in a manner severe enough to implicate Title VII, as Title VII is not a "generalized 'civility code.'"  Jensen, 435 F.3d at 452 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).  Rather, the statute "prohibits severe or pervasive harassment; it does not mandate a happy workplace.  Occasional insults, teasing, or episodic instances of ridicule are not enough [because] they do not 'permeate' the workplace and change the very nature of the plaintiff's employment."  Jensen, 435 F.3d at 451.  Factors to be considered include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  No single factor is dispositive, and the analysis focuses on the totality of the circumstances.  Id. (citing Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).

20

In this case we find that the evidence in the record, taken in the light most favorable to the plaintiff, is sufficient to show that the plaintiff was subjected to intentional discrimination on the basis of race over a period of time in which he regularly was faced by racist utterances and threats directed at him, or in his presence, in the work place and over his repeated protests.  The record contains evidence showing numerous instances over a short period of time where the plaintiff claims he was called a "nigger" or "buckwheat" or "boy", and it is well established that these phrases are notorious racial epithets, and the plaintiff has cited to numerous cases so holding.  See Bailey v. Binyon, 583 F. Supp. 923, 927 (N.D. Ill. 1985) ("The use of the world 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se."); Ross v. Douglas County, 234 F.3d 391, 396 (8th Cir. 2000) (the only reason [plaintiff] was called a 'nigger' was because he was black"); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1266 (7th Cir. 1991) (observing that "Buckwheat" is a racial taunt); Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (use of term "boy" when addressing African-American employees may demonstrate racial animus, depending on the way in which the term is delivered).

In addition to these racially derogatory remarks, the plaintiff also observed a noose that had been cut down from a job site and stored in a file cabinet where the plaintiff encountered it on multiple occasions.  As with the racial epithets, a

hangman's noose "may constitute part of a hostile work environment claim" and is evidence relevant to establish the plaintiff's first prong of his claims in this case. Cf. Tademy v. Union Pacific Corp., 614 F.3d 1132, 1141 (10th Cir. 2008) (collecting cases).

While the defendant seeks summary judgment on this claim and cites to cases standing for the proposition that workplace conduct must be sufficiently severe in order to rise to the level of a "hostile work environment" under Title VII, at this point in the proceedings we find that the plaintiff has adequately made out this first prong of his case by pointing to numerous occasions where he faced overtly racist remarks, and later threats when he complained about this conduct.   Therefore, upon consideration, we find that summary judgment is not warranted on the record alone since it contains evidence that, if believed, could support a finding that he faced frequent racist comments by co-workers, directed at him as an African American, that could have affected his employment conditions.

The second prong of a hostile work environment claim, whether the harassment or discrimination was sufficiently severe or pervasive to create a hostile work environment is, as one district court noted, "quintessentially a question of fact." Rorrer v. Cleveland Steel Container, 712 F. Supp. 2d 422, 429 (E.D. Pa. 2010).  The Supreme Court has instructed that in order to assess whether comments in the

workplace are sufficiently severe or pervasive for Title VII purposes, a court should evaluate "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).

Although the defendant downplays the evidence in the record, and even goes so far as to say that "the overwhelming factual record produced through discovery is devoid of any evidence that plaintiff was subject to any adverse employment action by Heckmann based on his race," (Doc. 51, at 8.), we disagree with its interpretation of the evidence and whether it is sufficient to warrant summary judgment. The plaintiff has cited to numerous instances in the record to show that over a period of a few months, he was routinely subjected to virulent racist insults by co-workers; when he reported the comments they were initially ignored or not addressed adequately; and when Heckmann began to take the matter more seriously, the plaintiff's co-workers became threatening and the racial remarks continued unabated. The defendant urges this Court to interpret the racist remarks that the plaintiff claims to have encountered routinely throughout his short time with Heckmann as mere "stray remarks of racial animus," (Doc. 51, at 11.), but it would be improper for the Court to do so on the record presented, which could be interpreted as considerably

more than mere isolated offensive commentary.[4]  Instead, we find that whether the

plaintiff faced a work environment in which racially derogatory remarks were severe

and pervasive, or instead isolated and insufficiently harmful, is a question that should

be presented to a factfinder at trial where an informed judgment can be made.

Likewise, a factfinder is in the best position to judge whether the plaintiff

encountering, on multiple occasions, a hangman's noose that was stored in a file at

work aggravated what he already found to be a hostile work environment, or was

merely an unpleasant – but not actionable – aspect of his job.  The defendant will

have an opportunity to argue its interpretation of these facts at trial, as will the

plaintiff, but they cannot be disposed of through motions practice alone based on the

record presented, since the evidence of racially offensive language and imagery that

the plaintiff has cited to could be directly relevant to and supportive of his hostile

work environment claims that are already supported by exposure to pervasive racist

remarks.  See Francis v. Atlas Mach. & Welding, Inc., Civ. A. No. 11-6487, 2013

---

[4]  Moreover, "[w]hile simple teasing, off-hand comments, and isolated
incidents usually do not amount to discriminatory changes in the terms and
conditions of employment, the use of racial epithets – especially the word 'nigger,'
which has a long and sordid history in this country – can quickly change the
atmosphere, environment, and culture of a workplace from positive to poisonous."
EEOC v. Bimbo Bakeries USA, Inc., Civ. No. 1:09-CV-1872, 2010 U.S. Dist.
LEXIS 13654, 2010 WL 598641, *5 (M.D. Pa. 2010); see also Rodgers v. W.S.
Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993) (finding that the use of the word
"nigger" on just two occasions contributed to a hostile work environment).

U.S. Dist. LEXIS 20691, 2013 WL 592297, *5 (E.D. Pa. 2013) ("Repeated use of the racial epithet 'nigger' may support a finding of severe or pervasive harassment. That two nooses were allegedly hung from [co-workers'] workstation only strengthens [the plaintiff's] claim."); see also EEOC v. Bimbo Bakeries USA, Inc., Civ. No. 1:09-CV-1872, 2010 U.S. Dist. LEXIS 13654, 2010 WL 598641, *5 (M.D. Pa. 2010) ("[T]he use of racial epithets – especially the word 'nigger,' which has a long and sordid history in this country can quickly change the atmosphere, environment, and culture of a workplace from positive to poisonous."). Moreover, we are enjoined that a hostile work environment claim cannot be properly analyzed on an incident-by-incident basis, but instead we are to examine the totality of the circumstances presented. Viewing the record in this fashion, and considering the offensive conduct that is claimed to have occurred multiple times, over months, and spanning the entirety of the plaintiff's brief employment with Heckmann confirms that summary judgment is unwarranted in this case.

The next element of this claim, whether the racist workplace comments had a subjective effect on the plaintiff, is fully satisfied here for purposes of summary judgment. The plaintiff has attested that he found the comments and work environment to be overtly hostile, threatening and even menacing at times, and he claims that it impaired his ability to perform his job functions, and eventually

impelled him to resign from work and seek medical care for depression and anxiety. There is evidence to support this aspect of the plaintiff's claim, and the defendants do not really argue otherwise.

We reach the same conclusion with respect to the fourth prong of the analysis regarding whether the conduct would have similarly affected other African Americans under similar circumstances. This object assessment is intended to protect employers from claims made by "hypersensitive" employees, Andrews v. City of Philadelphia, 895 F.2d 1469, 1483 (3d Cir. 1990), and is designed to assess whether the work environment was actually hostile and, therefore, actionable. The third and fourth prongs are both critical to a hostile work environment claim, id., with the subjective factor requiring that the employee actually perceive the environment as hostile, and the fourth factor requiring that "the finder of fact must actually determine whether the work environment is [racially] hostile." Id. The record contains sufficient facts to allow both the plaintiff and the defendant to present competing interpretations, and assessments, regarding the nature of the Heckmann work environment, and the existence of these disputed facts and their potential interpretation warrants against entering summary judgment.

Although the defendant disputes whether the plaintiff has sufficiently demonstrated the first four factors of his claims, it is the fifth factor that it argues

26

most emphatically in support of its motion.  Under the fifth factor, a plaintiff must

establish *respondeat superior* liability on the part of the employer for other

employee's actions by showing that the employer was aware of the problem and yet

failed to take prompt and appropriate corrective action in response.  Bouton v. BMW

of N. America, Inc., 29 F.3d 103, 110 (3d Cir. 1994).  The Third Circuit has explained

that an employer's awareness of Title VII harassment may be established in two

ways:

> [F]irst, where the employee is sufficiently senior in the employer's
> governing hierarchy, or otherwise in a position of administrative
> responsibility over employees under him, such as a departmental or
> plant manager, so that such knowledge is important to the employee's
> general managerial duties.  In this case, the employee usually has the
> authority to act on behalf of the employer to stop the harassment, for
> example, by disciplining employees or by changing their employment
> status or work assignments.  The employee's knowledge of [Title VII]
> harassment is then imputed to the employer because it is significant to
> the employee's general mandate to manage employer resources,
> including human resources.
>
> Second, an employee's knowledge of [Title VII] harassment will be
> imputed to the employer where the employee is specifically employed
> to deal with [Title VII] harassment.  Typically such an employee will be
> part of the employer's human resources, personnel, or employee
> relations group or department.  Often an employer will designate a
> human resources manager as a point person for receiving complaints of
> harassment.  In this circumstance, employee knowledge is imputed to
> the employer based on the specific mandate from the employer to
> respond to and report on [Title VII] harassment.

Huston v. P&G Paper Prods. Corp., 568 F.3d 100, 107-08 (3d Cir. 2010).  Where a plaintiff has shown that the employer was aware of a hostile work environment, the employer will be liable if it failed to take "prompt remedial action."  Bouton, 29 F.3d at 110.  Thus, as the plaintiff notes, this standard tracks well established negligence rules familiar to tort law.  See Vance v. Ball State Univ., 133 S. Ct. 2434 (2013) (noting that victims of harassment may prevail by showing that an employer was "negligent in permitting [the] harassment to occur, and that "a[n] employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment.").

The defendant insists that what it terms "appropriate management" took effective action when they became aware of the plaintiff's complaints, and were equipped with sufficient information to address the issue – something that the defendant argues the plaintiff delayed by failing to provide the names of the co-workers making the offensive comments.  (Doc. 51, at 14.)  The plaintiff, however, takes a more expansive view of Heckmann's managerial structure, and notes that Eichenlaub, Warzel and Little were all supervisory employees with the authority to discipline employees under the defendant's progressive discipline policy.  The plaintiff further notes instances where these employees acknowledged their authority in this regard, and thus argues that because of this authority, their knowledge should

28

be imputed to Heckmann under the first category of management identified in Huston. (Doc. 55, at 23-24.) The plaintiff further argues that Karen Martin, the human resources employee assigned to supervise the Hughesville site, fits within Huston's second category of human resources personnel who are empowered to respond to reports of harassment, and he argues that Martin's delayed and ineffective response to his complaints should also be imputed to Heckmann.

The plaintiff contends that the evidence shows that as early as May 2011, Hoover, the site manager at the Hughesville location, as well as other supervisors at that location, were aware that the plaintiff was being subjected to racist remarks in the work place, and yet did little or nothing to address or correct the matter. In addition, the plaintiff further points to evidence showing that Karen Martin had been notified about this problem in late June 2011, but did nothing to respond until mid-July, after the plaintiff notified her for a second time personally. At this point, the plaintiff notes that Martin had supervisors read a two-page script to staff during pre-shift meetings that addressed the issue of racial harassment in a very cursory and limited manner, but otherwise did not adequately monitor the situation.

The plaintiff argues that even though what he perceived as a campaign of harassment and threats against him continued throughout the summer, it was not until mid-August when an outside investigator's report was finally commissioned and

29

furnished to the company that Heckmann took decisive action and dismissed David Weidler.  Yet, even after firing Weidler, the plaintiff has pointed to evidence showing that problems at work, including racist language and threats from co-workers, continued, and that supervisors knew about it.  The plaintiff notes that after Carl Orso threatened him, apparently in retaliation for the plaintiff's reporting about the earlier conduct that resulted in Weidler's termination, little was done while he himself was disciplined for infractions that he claims were minor and related to his own feelings that he was being threatened.  Finally, the plaintiff has cited to record evidence to show that Heckmann failed to provide adequate training to its supervisors and even to its human resources personnel, thereby further contributing to the company's ineffective and dilatory response to his repeated complaints.[5]

The Court acknowledges the defendant's argument regarding what it maintains was a swift and effective response to the plaintiff's complaints, as well as the plaintiff's contention that supervisors failed to act promptly or effectively, and that human resources personnel were ill-trained and slow to act.  These arguments, however, do not eliminate a disputed issue of fact.  Rather, they define the factual

---

[5] Karen Martin, for example, testified that she did not receive any training or instruction during her employment with Heckmann.  (Martin Dep. at 52.) Heckmann's director of human resources, Deborah Carter-Gordley, stated that she was "too busy" for training or continuing education.  (Carter-Gordley Dep. at 29-30.)

dispute that lies at the heart of this case.  The record with respect to the adequacy of Heckmann's response is squarely in dispute, and will require consideration and assessment by a factfinder before it may be resolved.  As the plaintiff notes, courts have found that "[t]he promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve." Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999).  So it is in this case, and we believe it would be error for the Court to rule as a matter of law based on the record evidence that Heckmann responded sufficiently promptly and adequately to the plaintiff's complaints, which spanned months.  See Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007) (noting that an employer's actions may be found adequate as a matter of law where management undertakes an investigation of a complaint within a day after learning of the complaint, spoke with the harasser about the allegations, and warned that harassment will not be tolerated; but also noting that summary judgment has been found inappropriate where an employer's supervisor knew about the harassment for months, even where there is other evidence "that the alleged harasser's supervisor later took immediate action upon learning of the harassment.") (citing Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997)).  Where there are conflicts in the record, the Third Circuit has instructed "that a jury should decide whether the

employer's remedial action was prompt and adequate." <u>Andreoli</u>, 482 F.3d at 644.

This is the course that the record compels in this case.

For the foregoing reasons, we find that the plaintiff has come forward with

sufficient evidence to support his hostile work environment claims, and that summary

judgment is unwarranted on the record presented.   Accordingly, the defendant's

motion for summary judgment will be denied.

An appropriate order denying the motion will be entered.


                                        <u>*/s/ Martin C. Carlson*</u>
                                        Martin C. Carlson
                                        United States Magistrate Judge
Dated: March 27, 2015